Good morning, Gerald Brannon on behalf of Steve Landers. According to this court's established precedent, the Fourth Amendment in this case was implicated if Chugach Electric's Jeffrey Broman intended to assist law enforcement's efforts and if the Anchorage police knew of an acquiesce in Broman's intrusive conduct. So how do we know that Broman intended to assist law enforcement efforts? Well, first of all, we know that because of the prior contacts he had with Detective Dahl of the Anchorage police. She testified that she had contacted him on four or five previous occasions to check the high-low average power consumption levels on private property and testified that he knew from these contacts that she suspected a marijuana growth. Broman admitted that in every theft case he'd ever worked that he had conducted an unrestricted private property search while in the company of the police and presumably those included the previous contacts that he had with Detective Dahl. In my view, the pivotal question in this case is whether or not the representative of the power company was looking for marijuana growth. Is that what he was looking for in your view? Well, yes he was, Your Honor. Not only did he testify that he goes to the property to look for what the law enforcement group is looking for, he testified to that. That's in Excerpts Volume 2, 6, and 7. He admitted that his normal procedure was to make unrestricted property searches in each of those cases. Every time he went to search, he searched the property way beyond the meter and that was not authorized by the tariff agreement. He was not looking for unauthorized power use? Well, he was, but he didn't stop at the legal limit. The tariff agreement specifically designates Chugach's property and the homeowner's property. But does the tariff agreement control what his state of mind was? Didn't he testify that in his view, the tariff agreement didn't limit him? Well, I don't think that interpretation is even reasonable. But whether it's reasonable or not, was that his view of what his authority was? Well, his view of what his authority was is that he could trespass on private property to inspect any electrical device that was in the vicinity of the meter. That's what he testified, which is saying basically he can go wherever he wants to check something that's of electrical nature. But whether that's accurate or not, doesn't that support the premise that he was not acting as an agent of the police, but he was acting within his perceived authority as a representative of the utility company? Well, I think he was acting as an agent of the police, and I think one really critical fact is his history. He was a military policeman for three years, specifically investigating drug offenses and specifically marijuana offenses. And because of that, I think he was predisposed to conduct these searches, and that's consistent with U.S. v. Reed, in which the manager of the hotel had taken metro courses in how to determine when somebody was dealing drugs from the hotel room. And the court actually pointed out that fact and noted that that played heavily into the manager's decision to enter the room in the first place. The same thing in Walther, U.S. v. Walther, where a Western Airlines employee had opened ten speed packs at the airport based on speculation and had then called the DEA, and the DEA continued to allow him to do that. So I think the fact that Vroman was in fact a police officer and had engaged in many, many investigations, I think that figured into his decision to conduct these unrestricted property searches. What authorization? Does it matter whether he's... Let's assume there's a junior detective out there deciding, I'm going to be tough on crime and I'm going to do this, that, or the other, and he does it. He follows, he does this and does this, and he gets legitimate information in a legitimate way. How do we say there's a Fourth Amendment violation? Well, because the police were guarding him the whole step of the way. They were acting as lookouts, they were banging on doors. They followed him through the entire hour-long search beyond the meter on the property, and that allowed him to conduct the search he did conduct. Because I don't think there's anybody in this room that would agree that an electric company employee could come to your house, do what he's authorized to do, which is examine the meter, and then proceed to snoop around the rest of the property. I don't think there's anybody that would agree that that's what... But that's not the question. The question is, does that then become an act by the state? You could probably, maybe have a cause of action against the power company for trespass by its agent, but the pivotal issue is whether or not that becomes an action of the state. Yes, and I think it did. As a matter of fact, Broman had authority to examine the Chugach Electric's property from the transformer to the meter, not beyond. Even though he said beyond, he said it as an afterthought. I don't think his interpretation is credible. If you read the tariff agreement, it doesn't really say that. I don't think it even implies that. But he didn't stop there. He had alternative means with which to check the meter. And by the way, he went to the property. The only reason he went to the property, and this is critical, was because he knew that the police suspected a marijuana grow. Other than that, he had no reason to think that there was anything abnormal about the power uses on the property. He testified to that. But for the fact that Detective Dahl told him this was a suspected marijuana grow, he had no other reason to go to the property. Under normal circumstances, if he went to a property and the meter was inaccessible like it was here, he could have waited for Mr. Lander to show up, gain legitimate access to the meter, and made the determination right there. Now, the police as well. The police, how do we know that law enforcement knew of and acquiesced or encouraged Froman's intrusive conduct? Because if they did, that does implicate the Fourth Amendment. We know that because the standby officers were briefed about the marijuana grow and went to the property with the intent to search it. They admit that. Counsel, wasn't there a sign outside the property, and I'm paraphrasing, if you enter this property you'll be bit by a dog or shot or both? Oh, yeah. So wouldn't it be reasonable for a utility person who's going there to ask the police to come and keep the peace if there's a sign like that that greets you at the entrance? Absolutely. Actually, civil standby officers are authorized to keep the situation safe for the civilian search or the civilian contact, and they could have easily done that by going through the property quickly, making sure nobody was there, retreating to the driveway so they could intercede if there were any unannounced visitors, and leave Jeffrey Broman to his work for the electric company. They didn't do that. They were there, and they admitted. Officer Marino admitted he was there to conduct a criminal investigation and therefore was acting beyond his civil authority. He admitted he was there to assist the power company's investigation. He admitted he had no permission to be on the property in a criminal capacity without a warrant or consent. And he admitted that he failed to stop Jeffrey Broman from conducting what was obviously an extended, unlawful search of the property. He said that. He said, in the normal circumstance, I confront people about the scope of their search. He said he didn't do it in this case. He admitted he didn't do it in this case. So these officers were not a de minimis contact, a minimal contact at all. Did you want to save any time for review? Yeah, I'd like to save two minutes. Well, you have one minute and eight seconds and counting. Thank you. May it please the Court. My name is Joanne Farrington, and I represent the United States. You're going to have to keep your voice up, or you're not going to be doing anything but wasting your time. I'll do my best, Judge.  As has been focused on for the last few minutes, the resolution of this appeal turns on whether Chugach Electric's inspection of this property was supported by a legitimate private interest, or whether Supervisor Jeff Broman was, in fact, acting as an instrument or an agent for the state, because the Fourth Amendment applies only to state action, obviously. And the lead case here is United States v. Cleveland, which is very close to being on all fours with the situation in this case. That case also involved a power company's inspection of a suspected power theft because of information that the power company had received that there was a possibility of a marijuana grow on the property. That case made three critical points, all three of which are of central importance here. First, it held that a power company's interest in detecting and putting a stop to suspected power thefts is a legitimate independent interest. It held that the presence of police nearby providing civil standby protection against violence does not transform the power company's inspection in the state action. Counsel, in Cleveland, isn't it true that the PGE, the electric company, not the police initiated the search? In this case as well, Chugach Electric initiated the search. Evidence is undisputed that it was Mr. Broman who decided on his own to go and conduct an inspection of the property. Detective Dahl did not ask him to do so. She didn't suggest that he do so. She didn't ask him to report back to her as to what he found. In both cases, it was the power company that said, hmm, there's a possibility that there's a power theft going on here, and we need to go check that out. And was there any difference in the actions by the police in Cleveland? Did they act as passive lookouts, or did they accompany the utility representative throughout the property? The setting in Cleveland was a residential neighborhood, and the police parked in front of the property, as the opinion describes, about a block away, where they could watch what transpired on the property. In this case, the driveway, it was described as being between a quarter and a half a mile up the road, and the police obviously had to accompany the power company personnel. The entire time? They didn't know who was there, or whether there was someone inside the property.  But again, the testimony is undisputed that once there, they did not participate in the search. They stood by. They did not direct the power company as to what they should do. They did not ask for any information. They simply stood there keeping the peace, and then when Mr. Landers appeared, they did intervene and stop him from accosting the power company personnel. Ms. Farrington, let's think a minute about the affidavit in support of the search warrant to search for marijuana. And I'm getting to the question as to whether there should have been a Franks hearing. It seems to me that there may have been a couple of statements in the affidavit that were attributable to Roman, and Roman said no, he didn't make those statements. Now, the first one I'm thinking about is the 50-amp reading from the feed line, and he said, well, that was excessively high when compared to the power consumption reading from the meter. That was in the affidavit. But he said, I didn't ever say that. The second one was when he talked about anomalies in the power consumption on the property. At least that was in the affidavit. But he said, no, I never said that. Now, what about those two? Are those the kind of misrepresentations that if we were to remove those from the warrant, there would be a question as to its sufficiency, as from the affidavit, that there would be a question as to the sufficiency of the warrant? The answer is different with respect to the two statements. That's the last point that Your Honor made. With respect to his observations about the 50-amp draw on the live wire, I believe that if those were excised from the warrant, there would be a serious question as to whether probable cause remained. With respect to his comment about word usage, whether he said there was an anomaly or not, that simply is preliminary information explaining why he decided to go and do the power check and doesn't contribute to the probable cause that there was a power theft going on. But to get back to the initial part of the question, neither of those statements, I don't believe, were inaccurately reported, and the district court so found. In fact, Mr. Broman said, I don't think I would have used the word anomaly, but the district court observed that Detective Dahl noted that she had actually taken notes because she didn't understand electricity or how it worked, so she had actually taken notes of what he had told her and transformed his communications into the affidavit, which also, I believe, explains the issue as to the 50-amp usage. It seems clear reading the affidavit that what she's communicating is that compared to the low usage over time that he had observed the day before as to the property's prior metering, that if that 50-amp load was being sustained over any period of time whatsoever, that usage was far too low. That's what she was communicating. It's not that he had taken a meter reading there and had been somehow able to tell that there wasn't a 50-amp load being registered, that you can't do it that way. It's looking at the usage over time, and, oh, there's actually a lot of electricity being used at this property. True, it's possible, it's theoretically possible that was only an instantaneous use and that something was turned on for a few minutes and then turned off, but that's not likely, and that's not required for probable cause. So the district court specifically found on the record that he saw no evidence of any misrepresentation and certainly no deliberate misrepresentation on Detective Dahl's part. And what's our standard of review on that? The standard of review is whether or not the district court's factual findings were clear error. It's totally erroneous that you do review DeNova, the search warrant affidavit. Right, but on the issue of whether or not there was a mistake in the affidavit, we review the district court judge's factual finding on that. Clearly, it's unclear. Yeah. Well, unless your honors have additional questions, I believe that I'll rely on the brief for the remaining issues. If he has not, thank you, counsel. Thank you. Rebuttal? Your honor, does that clear it up? I wasn't clear on that. The court reviews DeNova. The district court's determination whether probable cause is lacking because of alleged misstatements or omissions in the support affidavit. Right, but the district court finding of whether or not there was a misrepresentation in the affidavit is a factual finding that we review for clear error. Yeah. Right. I think there was clear error here. I want to address, with respect to the district court's findings, with respect to the misstatements that tend to mislead that are in the affidavit, but I just want to address a couple of points she made. In both Miller and Cleveland, the officers were really careful to honor the Fourth Amendment rights of the property owner. In Cleveland, the officers sat in his patrol car, made sure everything was safe. Then he went, sat in his patrol car a block away. In Miller, involved a larger property, maybe not as large as this one, but it was a large property. It was in a rural or semi-rural area where the police were also very concerned about protecting the Fourth Amendment rights of the property owners. They watched the private citizen from a distance go onto the property and actually watched him through binoculars. Both of those sets of civil officers were concerned about the safety of the private party, but also concerned about the Fourth Amendment rights of the property owner. All you need for the implication of the Fourth Amendment is acquiescence and encouragement. In this case, these officers didn't stand by, check the property for occupants, then stand at the driveway where they could have protected Vroman easily. They followed him during the entire course of the search, the hour-long search. In fact, what came out at the trial, at the court trial later, Vroman was on the property for 10 to 12 hours, during which time he even went into the larger structure and connected wires to help the police find the exact location of the marijuana grow. That's the scope of his participation in this search. So I think that very clearly in this case, which has no relationship with Cleveland whatsoever and is really close to Reed, U.S. v. Reed. All right, counsel, thank you. Thank you. Thank you to both counsel. The case was argued and submitted for decision by the court. The next case on calendar for argument is United States v. Raines.
judges: Farris, Thompson, Rawlinson